IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 21, 2019 Session

## KALPESH PATEL and PRATIKKUMAR V. PATEL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Rutherford County**
**Nos. F71339A, F71339B       David Bragg, Judge**

_____

### No. M2018-01885-CCA-R3-PC

_____

The Petitioners, Kalpesh Patel and Pratikkumar V. Patel, appeal from the Rutherford County Circuit Court's summary dismissal of their respective petitions for post-conviction relief from their 2015 convictions for conspiracy to commit first degree murder and solicitation to commit first degree murder, for which the Petitioners each received fifteen-year sentences. The Petitioners contend that the post-conviction court erred by summarily dismissing their petitions for relief and motions to reconsider because (1) they received the ineffective assistance of trial counsel and (2) the trial court erred by denying their respective motions to suppress cell phone evidence at the trial. We affirm the judgments of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and JOHN EVERETT WILLIAMS, P.J., joined.

Worrick G. Robinson IV, Nashville, Tennessee, and Manubir S. Arora, Atlanta, Georgia, for the appellants, Kalpesh Patel and Pratikkumar Patel.

David L. Raybin (on appeal), Nashville, Tennessee, for the appellant, Pratikkumar V. Patel.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sarah N. Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioners' attempt to hire someone to kill Petitioner Pratikkumar's wife. In the previous appeal, this court summarized the facts as follows:

Christopher Robinson testified at trial that he was a construction worker living in Rutherford County and that he had never been arrested or in any kind of "criminal" trouble. Mr. Robinson further testified that he had known Defendant Kalpesh for six or seven years. Mr. Robinson explained that he had frequented one of Defendant Kalpesh's stores, that he got to know Defendant Kalpesh, and that he then began doing construction jobs at Defendant Kalpesh's stores and home. Mr. Robinson recalled that in September 2013, he was "doing a water line" at one of Defendant Kalpesh's stores when Defendant Kalpesh asked Mr. Robinson if he "would like to do some work for one of [Defendant Kalpesh's] cousins at another store." Mr. Robinson told Defendant Kalpesh that he "would be interested."

On September 29, 2013, Defendant Kalpesh called Mr. Robinson and asked him to meet at the store to discuss the work with Defendant Kalpesh's cousin. When he arrived at the store, Defendant Kalpesh had Mr. Robinson go to "the back room" where Defendant Pratikkumar was waiting for them. Mr. Robinson testified that he had never met Defendant Pratikkumar before. Mr. Robinson claimed that Defendant Pratikkumar had a gun "[o]n his side" during their meeting and this made Mr. Robinson "real nervous." According to Mr. Robinson, Defendant Pratikkumar stated that he needed "someone to kill [his] wife" and that he would pay $50,000 "to have it done." Mr. Robinson testified that he initially thought the Defendants "were joking around," but Defendant Pratikkumar "kept going into details [about] how he wanted it done."

Mr. Robinson explained that Defendant Pratikkumar wanted his wife shot and a "backup plan" in case "it could not go that route." According to Mr. Robinson, Defendant Pratikkumar wanted his wife killed "as soon as possible." Defendant Pratikkumar told Mr. Robinson that he would leave his house around 8:00 a.m., that he wanted his wife killed by 8:30 a.m., and that he "would come back and make sure the job was done." Defendant Kalpesh was to pay Mr. Robinson once Defendant Pratikkumar confirmed that his wife was dead. Mr. Robinson testified that Defendant Pratikkumar stated that his wife "had to be gone" and that Defendant Pratikkumar seemed "very excited" that his wife would soon be dead.

According to Mr. Robinson, Defendant Pratikkumar provided Mr. Robinson with his wife's address, a description of her car, and her license plate number. Defendant Pratikkumar told Mr. Robinson that Defendant Kalpesh would provide him with a gun the next day. Defendant Pratikkumar also told Mr. Robinson that his "daughter would be asleep in [her] bedroom" and that Mr. Robinson was to shoot his wife and "let the little girl sleep." Mr. Robinson recalled that "[i]t didn't matter" to Defendant Pratikkumar if he killed Defendant Pratikkumar's wife or arranged for someone else to "as long as it was taken care of." Mr. Robinson was left with the impression that "[t]he only thing [Defendant Pratikkumar] wanted to make sure [of] was that [his wife] was dead."

Mr. Robinson testified that Defendant Pratikkumar was "[k]ind of upset" when he suggested that Defendant Pratikkumar "get a divorce." According to Mr. Robinson, Defendant Pratikkumar stated "that he had two people in Gallatin that [were] going to take care of" killing his wife, but that he wanted Mr. Robinson "to do it" because Defendant Kalpesh trusted him. Mr. Robinson recalled that Defendant Kalpesh was in the room during this conversation with Defendant Pratikkumar and that Defendant Kalpesh was "shaking his head" in agreement with what Defendant Pratikkumar was saying.

Mr. Robinson testified that he was "in shock" during his conversation with the Defendants. Mr. Robinson further testified that he told Defendant Pratikkumar that he "would make sure that it happened" in order to "buy time for" Defendant Pratikkumar's wife. Defendant Pratikkumar then left the store. According to Mr. Robinson, he asked Defendant Kalpesh why Defendant Pratikkumar could not just get divorced and Defendant Kalpesh told him that Defendant Pratikkumar's "family would disown him if [he] got a divorce." Mr. Robinson also claimed that Defendant Kalpesh told him that Defendant Pratikkumar "had this planned for a long time." Mr. Robinson testified that he then left the store and went to work without telling anyone about what had happened because he "thought it was a joke."

The next morning, September 30, 2013, Defendant Kalpesh called Mr. Robinson and asked to meet him in the parking lot of a Sam's Club in order to pay him for a previous construction job. Defendant Kalpesh did not tell Mr. Robinson that Defendant Pratikkumar would also be there. Mr. Robinson parked his truck and, after a few minutes, Defendant Kalpesh parked his van on one side of the truck and Defendant Pratikkumar parked his van on the other side of the truck. A recording from the Sam's Club's video surveillance system depicting the parking lot at approximately 9:30

a.m. on September 30, 2013, was played for the jury. Mr. Robinson identified his truck and the Defendants' vans on the surveillance video. According to Mr. Robinson, Defendant Kalpesh got out of his van and got into Defendant Pratikkumar's van. A short time later, Defendant Kalpesh called Mr. Robinson and told him that Defendant Pratikkumar wanted to talk to him.

According to Mr. Robinson, Defendant Kalpesh got out of Defendant Pratikkumar's van holding "a sack." Mr. Robinson testified that when he got in Defendant Pratikkumar's van, he asked "what was in the bag," and Defendant Pratikkumar responded that he had given Defendant Kalpesh "$50,000 in cash." Mr. Robinson further testified that Defendant Pratikkumar told him that Defendant Kalpesh was taking the money "to trade that cash in" at a different bank so "it would not be traced back to the bank" it was withdrawn from. Mr. Robinson claimed that Defendant Pratikkumar then "started describing everything that he wanted done." Defendant Pratikkumar gave Mr. Robinson a picture of his wife, and Mr. Robinson used his cell phone to take a picture of it. Defendant Pratikkumar also gave Mr. Robinson his address, a description of his wife's car, and "her tag number." Mr. Robinson testified that he wrote all of this information down on a piece of paper.

Mr. Robinson claimed that Defendant Pratikkumar said that he wanted his wife killed the next morning. According to Mr. Robinson, Defendant Pratikkumar told his wife that a "handyman" would be coming to their house that morning to make some repairs. Defendant Pratikkumar instructed Mr. Robinson to shoot his wife in their bedroom and to "throw stuff around" so it would look "like a robbery gone bad." Mr. Robinson further claimed that Defendant Pratikkumar told Mr. Robinson to let his daughter "sit there and cry" if she woke up during the murder. Mr. Robinson further testified that he and Defendant Pratikkumar discussed having "another person" commit the murder. Mr. Robinson claimed that he agreed to arrange the killing without "getting [any]thing out of it."

Mr. Robinson testified that he told Defendant Pratikkumar that he would "make sure that it got done" and went back to his truck. As Defendant Pratikkumar drove away, Mr. Robinson wrote down Defendant Pratikkumar's license plate number and a description of the van on the same sheet of paper that he had previously written down the information about Defendant Pratikkumar's wife on. Mr. Robinson testified that he then went to one of Defendant Kalpesh's stores. According to Mr. Robinson, Defendant Kalpesh gave him a box containing $15,000 in cash. Mr. Robinson also claimed that Defendant Kalpesh stated that he had not

bought a gun, that he wanted Mr. Robinson "to purchase the gun," and that he would give Mr. Robinson "a couple thousand dollars for the gun after it was all said and done." Defendant Kalpesh then allegedly instructed Mr. Robinson to dispose of the gun after the murder by throwing it in a river.

Mr. Robinson testified that, after the events of that morning, he believed the Defendants were serious about having Defendant Pratikkumar's wife killed. Mr. Robinson called a local attorney, Rick Mansfield, and told him about his conversations with the Defendants. Mr. Mansfield had Mr. Robinson call another local attorney who was a former prosecutor and had contacts with the Tennessee Bureau of Investigation (TBI). As a result of these conversations, Mr. Robinson was contacted by TBI Special Agent Caleb Utterback. Agent Utterback met with Mr. Robinson at one of Mr. Robinson's jobsites. Mr. Robinson gave Agent Utterback the box containing $15,000 and the piece of paper with the information he had written down during his meeting with Defendant Pratikkumar at Sam's Club. Mr. Robinson also showed Agent Utterback the picture of Defendant Pratikkumar's wife that he had taken with his cell phone.

Later that day, Defendant Pratikkumar called Mr. Robinson. Mr. Robinson did not answer the phone and contacted Agent Utterback. Agent Utterback arranged to meet Mr. Robinson in the parking lot of a local store, so Mr. Robinson could call back Defendant Pratikkumar and their conversation could be recorded. Defendant Pratikkumar did not answer his phone when Mr. Robinson called him, but he called Mr. Robinson back a short time later. This conversation was recorded and played for the jury at trial. Mr. Robinson started the conversation by confirming the license plate number of Defendant Pratikkumar's wife's car. The following exchange then occurred:

> [Mr. Robinson]: [Okay], what time did you want me to be at Almaville Market tomorrow?
>
> [Defendant Pratikkumar]: Um, you mean after you finish the work?
>
> [Mr. Robinson]: Yeah, after the work[']s finished. I mean he's going to be doing the work, but what time do you want me there at the store?

[Defendant Pratikkumar]: Oh, you can meet anytime. I mean as soon as you call me from the store, the work is done; your work is done too.

[Mr. Robinson]: [Okay], so, and [Defendant Kalpesh] does have the rest of the money sitting there, right?

[Defendant Pratikkumar]: Yep . . . .

[Mr. Robinson]: [Okay], I mean, uh

[Defendant Pratikkumar]: I mean as soon as you know on your phone that it's done. You know? Then [Defendant Kalpesh] will take care of it. He'll get it before he gets there.

[Mr. Robinson]: [Okay], I just wanted to make sure, buddy, because my man is asking me, and I just need to make sure that everything's lined up and set to go. But you are sure you want this done?

[Defendant Pratikkumar]: What did you say?

[Mr. Robinson]: I said, you are sure that you want this done? Cause once I hang up it's over with. Come tomorrow at [8:30 a.m.] it's done.

[Defendant Pratikkumar]: Yes, I want everything done by [8:29 a.m.], not even [8:30 a.m.] . . . everything should be done.

[Mr. Robinson]: [Okay], you want it done by [8:30 a.m.]?

[Defendant Pratikkumar]: That's it. No back up now.

[Mr. Robinson]: [Okay], well, I'm not going to back out. What time are you going to be leaving the house?

[Defendant Pratikkumar]: [8:00 a.m.].

[Mr. Robinson]: [8:00 a.m.]. [Okay], well, everything is lined up, everything is set to go. I will not talk to you [any] more [un]til tomorrow. And once it's done, ah, make sure the money is there because my man's not going to play around.

[Defendant Pratikkumar]: That's it. You don't need to worry about the rest of the thing. As I say, once this work [is] done [the] right way, the way I want it, you will remember that day. I will always take care of you nicely . . . .

[Mr. Robinson]: [Okay], buddy, I do appreciate it, I'm fixing to get off here and, uh, I will talk to you tomorrow.

[Defendant Pratikkumar]: Yeah, I just need you to be 100%, that's what I need.

[Mr. Robinson]: 100%, you've got 110% of me.

[Defendant Pratikkumar]: That's it man. Alright man.

[Mr. Robinson]: Alright, bye.

[Defendant Pratikkumar]: Bye.

Shortly after the first conversation ended, Defendant Pratikkumar called Mr. Robinson again wanting to make sure that he had "the address and everything." Mr. Robinson confirmed Defendant Pratikkumar's address and the description of Defendant Pratikkumar's wife's car. Then, the following exchange took place:

[Mr. Robinson]: I did, [okay]. That's what I wanted to make sure of so everybody's on the right page, and we asked you –

[Defendant Pratikkumar]: You are my handyman for my new store, [okay]? We are trying to build a counter. And, uh, we are cool and everything and you can invest in it.

[Mr. Robinson]: [Okay].

[Defendant Pratikkumar]: So make sure you do my work, [okay]?

[Mr. Robinson]: Does your wife know that the handyman is going to be there to work on the doors and the floor in the morning?

[Defendant Pratikkumar]: Yes, sir.

[Mr. Robinson]: [Okay], and the baby is supposed to be asleep, right?

[Defendant Pratikkumar]: Yes.

[Mr. Robinson]: [Okay], that's all I need to make sure of buddy. Everything is set to go.

[Defendant Pratikkumar]: [Okay]. You got it. Bye-bye.

[Mr. Robinson]: Bye.

Mr. Robinson testified at trial that he had no idea what Defendant Pratikkumar was referring to when he mentioned a counter being built at a new store.

Mr. Robinson admitted on cross-examination that he told the Defendants that he would not personally kill Defendant Pratikkumar's wife. Mr. Robinson also admitted that he told Agent Utterback that he had told the Defendants that he would "see what [he] could do." Mr. Robinson further admitted that he only pretended to find a "hitman" in order to "buy time" for Defendant Pratikkumar's wife and that he had no intention of actually hiring a "hitman" for the Defendants. However, Mr. Robinson testified that the Defendants did not know that he was pretending and that they believed he would "make [it] happen." Mr. Robinson speculated that the Defendants solicited him to kill Defendant Pratikkumar's wife because Defendant Kalpesh thought he was trustworthy.

Mr. Mansfield testified at trial that he was an attorney practicing mostly in real estate and probate law and that he had known Mr. Robinson for approximately twenty years. Mr. Mansfield explained that he had initially represented Mr. Robinson in a workers' compensation matter. Since the conclusion of that matter, Mr. Mansfield hired Mr. Robinson to do carpentry work for him on numerous occasions. Mr. Mansfield testified that he believed that Mr. Robinson was an "honest person" and that there was "no doubt in [his] mind" that Mr. Robinson was a truthful person. Mr. Mansfield explained that he trusted Mr. Robinson with the keys to his home and office and that he had referred Mr. Robinson to others who needed carpentry work done.

Mr. Mansfield recalled that Mr. Robinson called him on September 30, 2013, and that Mr. Robinson was "terribly upset." Mr. Robinson told Mr. Mansfield about his conversations with the Defendants and that he had

been asked to kill Defendant Pratikkumar's wife. Mr. Mansfield testified that he contacted another local attorney, Thomas Parkerson, to ask what Mr. Robinson should do about his conversations with the Defendants. Mr. Parkerson told Mr. Mansfield that he would "hook [Mr. Robinson] up with the [TBI]." Mr. Mansfield had Mr. Robinson call Mr. Parkerson and that ended his participation in this matter.

Agent Utterback testified at trial and corroborated Mr. Robinson's testimony about their interactions on September 30, 2013. Agent Utterback testified that arrest warrants for the Defendants were issued after Mr. Robinson's recorded phone conversations with Defendant Pratikkumar. Agent Utterback arrested Defendant Kalpesh while other TBI agents arrested Defendant Pratikkumar. The Defendants' wallets and cell phones were seized during their arrests. After their arrests, subpoenas were issued for the Defendants' cell phone records and Defendant Pratikkumar's banking records. Agent Utterback admitted that he never found anyone who had agreed to kill Defendant Pratikkumar's wife and that he had no reason to believe that Mr. Robinson would do so.

Defendant Pratikkumar's banking records revealed that he had made cash withdrawals of $9,000 from a business account on September 3, September 6, September 12, September 18, September 20, and September 24, 2013. On September 30, 2013, Defendant Pratikkumar made a $9,000 withdrawal at 8:43 a.m. and an $8,000 withdrawal at 11:00 a.m. The $17,000 withdrawn on September 30, 2013, was Defendant Pratikkumar's largest withdrawal of cash in the previous six months and the only instance during that time when he had withdrawn more than $10,000 in one day. The Defendants' phone records showed numerous calls between the Defendants from September 27 to September 30, 2013.

A forensic examination of the Defendants' cell phones was performed by TBI Special Agent Chet Mason. Agent Mason was able to recover text messages from Defendant Pratikkumar to Tina Newman and Marcus T. Henderson, Sr. Agent Mason was also able to recover a deleted text message from Defendant Pratikkumar to Defendant Kalpesh asking for Mr. Robinson's cell phone number as well as Defendant Kalpesh's response. Agent Mason testified at trial that the forensic examination revealed that Defendant Pratikkumar had deleted the call logs for his phone calls with Ms. Newman and the text messages, chat threads, and voicemails he had exchanged with her.

Agent Mason testified that he was able to recover Defendant Pratikkumar's deleted internet history from the cell phone. Prior to

September 30, 2013, Defendant Pratikkumar had conducted several internet searches and visited several websites regarding topics such as "can a person go to jail if they accidentally killed someone when shooting a gun in the woods," "homicide definition," "if you shot someone by mistake is it criminal," "what is the prison sentence for killing someone on accident," "if you accidentally committed a serious crime and knew you would go to jail, would you run," and "can you get in trouble if you accidentally kill someone while cleaning your gun."

Ms. Newman testified at trial that she was a recent college graduate and worked at a domestic violence shelter. Ms. Newman recalled that in May 2010, she had gone on a "study abroad" trip to India. In September 2010, Ms. Newman met Defendant Pratikkumar at one of his stores and struck up a conversation with him about the fact that she had "just got back from India." Ms. Newman testified that a few weeks after their initial conversation, she "friended" Defendant Pratikkumar on Facebook and they scheduled a lunch date. Ms. Newman further testified that she divorced her husband in January 2011. According to Ms. Newman, she began working as "the errand girl" for Defendant Pratikkumar and began a romantic relationship with him around the time of her divorce.

Ms. Newman testified that she was in a romantic relationship with Defendant Pratikkumar from January 2011 until his arrest in October 2013. Ms. Newman would share her class schedule with Defendant Pratikkumar so "he could arrange his schedule to" hers. When Ms. Newman moved to Cookeville to finish college, Defendant Pratikkumar would visit her at least once a week. Ms. Newman testified that Defendant Pratikkumar helped pay her rent and college tuition. Ms. Newman made Defendant Pratikkumar the beneficiary of her life insurance policy. Ms. Newman and Defendant Pratikkumar took trips together. On those trips, Defendant Pratikkumar would refer to Ms. Newman as his wife. According to Ms. Newman, the Defendant told her that he loved her and that if they could not be together, she "may as well just . . . shoot [him]."

Defendant Pratikkumar introduced Ms. Newman to Defendant Kalpesh. Ms. Newman testified that the Defendants were very close and referred to themselves as "cousin brothers." Ms. Newman further testified that she believed Defendant Kalpesh knew she was in a romantic relationship with Defendant Pratikkumar. Ms. Newman introduced Defendant Pratikkumar to her parents. Ms. Newman testified that she was "really devastated and heartbroken" when she learned that Defendant Pratikkumar's wife was pregnant. In May 2013, Ms. Newman went to India and met Defendant Pratikkumar's family and stayed with them.

-10-

Ms. Newman testified that when she returned from her trip, she had a conversation with Defendant Pratikkumar and asked him, "[A]re we doing this or are we not doing this?" Ms. Newman recalled that Defendant Pratikkumar was "very quiet and shocked" about her question. According to Ms. Newman, Defendant Pratikkumar said that he was "working on it" and that they would "be together real soon." Ms. Newman also recalled that Defendant Pratikkumar wanted her assurance that she would be a good mother to his daughter.

Ms. Newman testified that in September 2013, Defendant Pratikkumar told her that it was okay for her to leave voicemails on his cell phone. Ms. Newman admitted that she and Defendant Pratikkumar were calling each other "darling" and texting "I love you" to each other around September 30, 2013. Ms. Newman recalled that on September 30, 2013, Defendant Pratikkumar told her that he was meeting Defendant Kalpesh because Defendant Kalpesh was going to repay some money he owed Defendant Pratikkumar.

Ms. Newman testified that Defendant Pratikkumar called her after his arrest and told her that he was in a lot of trouble and that she should not talk to anyone. Several weeks after Defendant Pratikkumar's arrest, Defendant Pratikkumar's father and a translator came to Ms. Newman's home. Ms. Newman claimed that they asked her to come to a van where Defendant Pratikkumar was waiting to speak to her. Ms. Newman denied knowing about Defendant Pratikkumar's plan to kill his wife.

Mr. Henderson testified at trial that he was the owner of Henderson Financial Group and that his firm catered to "affluent investors [and] affluent business owners." Mr. Henderson recalled that Defendant Pratikkumar was referred to him by one of his clients. Mr. Henderson met with Defendant Pratikkumar in July 2013 to discuss issuing life insurance policies for Defendant Pratikkumar and his wife. Initially, Defendant Pratikkumar asked for a one million dollar policy on his wife. He then asked for a two and a-half million dollar policy before finally requesting a six million dollar policy. Defendant Pratikkumar had a five million dollar policy taken out for himself. The insurance policies were issued in August 2013.

Mr. Henderson testified that he did not think the six million dollar policy was excessive given the financial information Defendant Pratikkumar provided him. Mr. Henderson further testified that the insurance company would not have issued the policy if it were excessive. Mr. Henderson met with both Defendant Pratikkumar and his wife before

-11-

the policies were issued. Mr. Henderson recalled nothing out of the ordinary occurred during their meeting. Mr. Henderson testified that nothing seemed unusual about their relationship and that there were no "red flags."

Mr. Henderson testified that Defendant Pratikkumar wanted to take out a second life insurance policy on his wife valued at four million dollars. Mr. Henderson recalled that Defendant Pratikkumar wanted ten million dollars in life insurance for his wife because her family was not as rich as his and he wanted to ensure that all their debts would be paid off if she died. However, prior to September 30, 2013, Defendant Pratikkumar requested that the application for the four million dollar policy be withdrawn because the insurance company issuing the policy had more stringent health requirements and the policy was going to be more expensive than the original quote.

Defendant Pratikkumar's wife, Krupaben Patel, testified at trial in his defense. Ms. Patel testified that she and Defendant Pratikkumar were partners in the ownership of two gas stations. Ms. Patel further testified that she participated in the decision to take out the life insurance policies. According to Ms. Patel, Defendant Pratikkumar told her about his affair with Ms. Newman after his arrest and she forgave him. Ms. Patel testified that she had never spoken to the prosecutors about this case. Ms. Patel admitted that no handyman came to her house on October 1, 2013.

*State v. Kalpesh Patel and Pratikkumar V. Patel*, No. M2016-00460-CCA-R3-CD, 2017 WL 3669626, at *1-7 (Tenn. Crim. App. Aug. 25, 2017), *perm. app. denied* (Tenn. Jan. 17, 2018).

On May 7, 2018, Petitioner Kalpesh and Petitioner Pratikkumar filed identical petitions for post-conviction relief. The Petitioners each alleged that the trial court erred by admitting evidence obtained from warrantless searches of their respective cell phones and that the subsequent search warrants for the phones were not executed within the required time. The State responded that these issues were previously litigated in the trial court and on appeal from the conviction proceedings.

On June 11, 2018, the post-conviction court summarily dismissed the petitions for relief. The court found that the allegations in each petition focused on constitutional violations from the admission of evidence obtained from the Petitioners' cell phones and that the issue was litigated during a pretrial motion hearing, at the motion for a new trial hearing, and on appeal from the conviction proceedings. The court dismissed the petitions after determining that the grounds for relief had been previously determined. Afterward, the Petitioners filed a joint motion to reconsider the summary dismissals of

the petitions. They later filed an amended motion to reconsider, along with a memorandum of law. After hearing arguments from counsel, the court denied the motion on the basis that the Petitioners had in the amended motion to reconsider attempted "to veil" the evidentiary allegations related to the cell phones as allegations of the ineffective assistance of counsel. The court determined that the evidentiary issues related to the cell phones were "based solely on the [P]etitioners' disagreement" with this court's opinion in the previous appeal. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

## I.      Ineffective Assistance of Counsel

The Petitioners contend that the post-conviction court erred by summarily dismissing their petitions for relief because they received the ineffective assistance of trial counsel. The State responds that the ineffective assistance allegation has been waived because it was not alleged in the petitions for post-conviction relief. Alternatively, the State asserts that the Petitioners raised an ineffective assistance allegation in the appeal from the conviction proceedings.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The Post-Conviction Procedure Act contemplates the filing of a single petition for relief, and our appellate courts have cautioned that raising ineffective assistance of counsel allegations in the direct appeal of the conviction is "fraught with peril." *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997); *see* T.C.A. § 40-30-102(c). Ineffective assistance of counsel is a single ground for post-conviction relief. *Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995). Therefore, "the fact

that such violation may be proved by multiple acts or omissions does not change the fact that there remains only one ground for relief." *William Edward Blake v. State*, No. 1326, 1991 WL 35744, at *2 (Tenn. Crim. App. Mar. 19, 1991). After a full and fair hearing at which a petitioner is "afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence," a ground for relief is considered previously determined. *See* T.C.A. § 40-30-106(h). A ground is previously determined "even if the petitioner fails to raise some of the factual bases upon which the rights violation could be based." *William Edward Blake*, 1991 WL 35744, at *2.

### A.    Petitioner Pratikkumar

The record reflects that Petitioner Pratikkumar alleged the ineffective assistance of trial counsel in his motion for a new trial and in the previous appeal. *See Kalpesh Patel and Pratikkumar V. Patel*, 2017 WL 3669626, at *16, *19-21. In the previous appeal, Petitioner Pratikkumar alleged that counsel "failed to investigate an alleged discrepancy in the amount of money [Petitioner] Kalpesh gave Mr. Robinson" and "failed to challenge the cell phone records Agent Utterback administratively subpoenaed." *Id*. Trial counsel testified at the motion hearing regarding the ineffective assistance allegations. *Id*. at *20-21. This court concluded that Petitioner Pratikkumar did not receive ineffective assistance. *Id*. at *21. As a result, Petitioner Pratikkumar's ineffective assistance claim against trial counsel has been previously determined, precluding its consideration in this petition for post-conviction relief.

### B.    Petitioner Kalpesh

We, likewise, conclude that Petitioner Kalpesh is not entitled to relief on this basis. He did not allege the ineffective assistance of counsel in his petition for post-conviction relief. The petition focused on the warrantless search of the cell phone and on the timeliness of the execution of the subsequent search warrant. It was not until the post-conviction court summarily dismissed the petition on the basis that these two allegations had been previously determined that the Petitioner asserted ineffective assistance. The ineffective assistance claim was not asserted until the amended motion to reconsider, along with a memorandum of law. The Petitioner was required to include in his petition "all claims known to the petitioner for granting post-conviction relief[.]" T.C.A. § 40-30-104(d). Therefore, Petitioner Kalpesh's ineffective assistance allegation is waived for failing to raise it in his petition for relief.

To the extent that both Petitioners argue that the motion to reconsider, the amended motion to reconsider, and the memorandum of law were an attempt to file an additional post-conviction petition, the Post-Conviction Procedure Act contemplates the filing of a single petition for relief. *See id*. § 40-30-102(c). The Petitioners are not entitled to relief on this basis.

## II. The Petitioners' Cell Phones

The Petitioners contend that they are entitled to post-conviction relief because the trial court erred by admitting cell phone evidence at the trial. The Petitioners argue that the trial court erred by denying their motions to suppress the evidence obtained during the warrantless searches of the phones and that the error was not harmless. The State responds that the allegation was litigated in the trial court and in the previous appeal and that, as a result, the issue was previously determined. Alternatively, the State asserts the claims should have been alleged during the conviction proceedings.

The Petitioners concede in their brief that the admission of the cell phone evidence was challenged in the trial court and in the previous appeal and that this court determined the admission of the evidence was harmless error. The Petitioners currently assert that this court improperly conducted a harmless error analysis and that this court should have determined that the admission of the evidence resulted in structural error.

The record reflects that in the previous appeal, the Petitioners challenged the trial court's denials of their motions to suppress evidence obtained during the warrantless searches of the Petitioners' cell phones. *See Kalpesh Patel and Pratikkumar V. Patel*, 2017 WL 3669626, at *10-13. The parties conceded that the warrantless searches of the cell phones violated the Petitioners' Fourth Amendment rights against unreasonable searches and seizures pursuant to *Riley v. California*, 573 U.S. 373, 401 (2014), in which the Supreme Court concluded that "a warrant is generally required before" law enforcement is permitted to search a cell phone. *See Kalpesh Patel and Pratikkumar V. Patel*, 2017 WL 3669626, at *11. This court, though, determined that the error was harmless because evidence of the Petitioners' guilt was overwhelming based upon Mr. Robinson's credited testimony, telephone conversations involving Petitioner Pratikkumar, the video recording from Sam's Club, and the evidence Mr. Robinson provided to Agent Utterback. *Id.* at *13. As a result, this issue has been previously determined, precluding its consideration in this petition for post-conviction relief.

To the extent that the Petitioners argue that this court's harmless error determination violated their constitutional rights, they had their appeal as of right from the conviction proceedings and sought second-tier review from our supreme court. *See State v. Kalpesh Patel and Pratikkumar V. Patel*, No. M2016-00460-SC-R11-CD (Tenn. Jan. 17, 2018) (order). The Post-Conviction Procedure Act does not provide a mechanism for the Petitioners to relitigate an evidentiary issue that was previously determined simply because the Petitioners disagree with this court's previous opinion and with the supreme court's denial of the application for permission to appeal. The Petitioners are not entitled to relief on this basis.

Based on the foregoing and the record as a whole, the judgments of the post-conviction court are affirmed.

                _____
                ROBERT H. MONTGOMERY, JR., JUDGE